IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

NEURO KINETICS, LLC.

     **Plaintiff,**

     vs.                        **Case No. 2:17-cv-00124**
                                    **The Honorable Mark R. Hornak**

DR. JAMES Z. CINBERG;
And THE BALANCE DISORDER     **AMENDED COMPLAINT**
CENTER OF NEW JERSEY, LLC.     **(Jury Trial Requested)**
     **Defendants.**


     **Filed on behalf of the Plaintiff.**
     **Neuro Kinetics, LLC.**


     **Counsel of Record for the Plaintiff:**

     **Blynn L. Shideler**
     **Pa. I.D. No. 64386**
     **3500 Brooktree Road**
     **Suite 200**
     **Westford, PA 15090**
     **(724) 934-5450**
     **blynn@blklawgroup.com**

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

**Neuro Kinetics, Inc.**                                    **CIVIL DIVISION**

**Plaintiff,**

                                                                **AMENDED COMPLAINT**

**vs.**

**Dr. James Z. Cinberg**                          **Case No. 2:17-cv-00124**
**The Balance Disorder Center**               **The Honorable Mark R. Hornak**
**of New Jersey, LLC**

**Defendants**

<u>**AMENDED COMPLAINT**</u>

        COMES NOW, Plaintiff, Neuro Kinetics, Inc., by its Attorney, Blynn L. Shideler,

to file this Amended Complaint as follows:

I.       <u>JURISDICTION AND VENUE</u>

1. This honorable court has original jurisdiction over the subject matter of this action

pursuant to 28 USC §1338 (a) and (b) as the claim set forth in newly added count 6 of

this amended complaint of the Plaintiff is a civil action arises under 35 USC § 256

relating to patents and the claim set forth in count 4 of this amended complaint is a claim

of unfair competition that is joined with a substantial and related claim set forth in count

6 under the patent laws.  The original complaint was filed in state court as GD-16-025206

and the Defendants removed the case to this court under 28 USC § 1441 and 1446

claiming diversity jurisdiction by this court under 28 USC § 1332.

2. This honorable court has personal jurisdiction over the parties and venue is proper in

this court for the subject matter of this action, as the actions upon which this complaint is

based occurred in Allegheny County, the Plaintiff, NKI, is has a principle place of

business in Allegheny County and the defendants, Dr. James Z. Cinberg and The Balance

Disorder Center of New Jersey, LLC have conducted business and other matters in Allegheny County.

## II.    PARTIES

3. Neuro Kinetics, Inc. (NKI) is a Pennsylvania corporation with a principle place of business in Allegheny County, Pennsylvania, at 128 Gamma Drive, Pittsburgh, PA 15238-2920.

4. The Balance Disorder Center of New Jersey, LLC (BDC) is believed to be a limited liability company of the state of New Jersey and has a place of business at 219 S. Broad St. Suite 3 Elizabeth, New Jersey 07202.

5. Dr. James Z. Cinberg (Dr. Cinberg) is believed to be an individual resident of New Jersey State and is believed to have has a residence address at 167 N Ridgewood Rd, South Orange New Jersey 07079-1550 and a business address of 219 S. Broad St. Suite 3 Elizabeth, New Jersey 07202.

## III. BACKGROUND

6.    NKI is the world leader in clinical eye tracking technology and non-invasive neuro-otologic diagnostic testing based upon NKI's I-Portal® product mix and for over 25 years NKI has supplied comprehensive neuro-otologic diagnostic tools to audiologists, ENTs, neuro-otologists, neuro-ophthalmologists and neurologists around the globe. Central to NKI's I-Portal® product mix and technological advances is the premise that

the eye is the portal to the brain as research has shown the detection of abnormal eye movements can indicate the presence of over 200 diseases and medical conditions.

7. Alexander D. Kiderman, Ph.D. (Dr. Kiderman) is a vice president of NKI and Chief Technology Officer of NKI and has been employed with NKI since 2003 working as a researcher and product developer. The entire right title and interest in any inventions made by Dr. Kiderman while he is employed by NKI are owned by NKI and Dr. Kiderman is obligated to execute any necessary assignments to perfect these rights in NKI.

8. In 2003 Dr. Kiderman lead a team which developed a goggle based portable lightweight video-occulography (VOG) system which technology was the subject of U.S. Patents Nos. 7,448,751; 7,520,614; 7,665,845; 7,731,360; 7,753,523; 7,866,818; and 9,101,296 of NKI [collectively the NKI Platform Patents, attached hereto as Exhibits 1-7].

9. Dr. Kiderman, working with others at NKI, developed commercial goggle based portable lightweight video-occulography system under the NKI Platform Patents which are commercially available to researchers under the I-PORTAL® brand since around 2003.

10. At least as early as 2008 Dr. Kiderman, working with others at NKI, developed an apparatus and associated method for quantitative, non-invasive, clinical diagnosis of traumatic brain injury (TBI) using a VOG device as set forth in provisional patent application 61/104,133 filed October 9, 2008, and which has resulted to date in at least

U.S. Patent Nos. 8,585,609, 9,039,631; and 9,039,632 of NKI [Collectively the NKI TBI Patents, attached hereto as Exhibits 8-10]. TBI is inclusive of mTBI or mild traumatic brain injury and the terms, for clinical diagnostics with which NKI is generally associated, may be used interchangeably. Concussion is a type of TBI, or mTBI, and all the terms, for clinical diagnostics with which NKI is generally associated, may be used interchangeably.

11. The systems and methods of the NKI TBI Patents utilized the device of the NKI Platform Patents.

12. The systems and methods of the NKI TBI Patents included the use of onboard stimulus generation for performing some of the standard testing.

13. The methods described in the NKI TBI Patents include a method for detecting TBI, comprising: presenting to a subject conventional optokinetic tests (Also called OKN tests and sometimes OPK tests) which include a visual stimulus, generally comprised of a number of stripes or dots, having a predetermined direction and speed of movement across a visual field of the subject; monitoring movements of an eye of the subject while the subject views said stimulus, wherein the eye movements of conventional optokinetic tests include a slow eye velocity component responsive to said predetermined movement and a fast eye velocity component; determining a magnitude of a parameter of the detected eye movements; and comparing the determined magnitude with a predetermined numerical value to determine whether the subject has incurred traumatic brain injury.

14. Optokinetic tests are extremely well known generic class of standard tests for eliciting and testing the "optokinetic reflex" which is a combination of a saccade (fast phase) and smooth pursuit (slow phase) eye movements.  The optokinetic reflex is seen when an individual follows a moving object with their eyes (smooth pursuit or slow phase), which then the object moves out of the field of vision and a new object moves into the field of vision at which point the subject's eyes rapidly move back (generally) to the new target position often similar to where the eyes were when the subject saw the prior object (saccade –or fast phase).  The optokinetic reflex develops at about 6 months of age.  The optokinetic reflex allows the eye to follow objects in motion while the head remains stationary, e.g., observing individual telephone poles on the side of the road as one travels by the poles in a car.  Optokinetic testing includes presenting a visual stimulus having a predetermined direction and speed of movement across a visual field of the subject, e.g., vertical stripes on a rotating optokinetic drum, or the reflection of light off of a rotating "disco ball" onto a surface generally appearing as dots moving along the surface.

15. In at least 2011 Dr. Cinberg and Dr. Kiderman began collaboration based upon Dr. Kiderman's earlier foundational prior art work using eye tracking of standard tests described in the NKI TBI Patents, specifically optokinetic tests, and comparing the obtained results of such tests with normative and/or baseline data to help determine whether the subject has incurred TBI.  The essence of the collaboration was concentrating originally on one standard test, optokinetic testing, to see if specific variables of this testing protocol alone could be used to significantly screen or identify the presence of TBI.

16.   A letter dated May 22, 2012 from Dr. Kiderman to Dr. Cinberg summarized the ongoing collaboration between the co-inventors Dr. Cinberg and Dr. Kiderman stating that as "a result of this Collaboration NKI and BDC believe they have identified a novel analytic variable with regard to concussions that is a subcomponent of the standard Optokinetic or OKN test.  That novel analytic variable is the fast phase component of a nystagmus beat. NKI and BDC are working together to examine existing OKN records from NKI's database to develop a normal analysis of the fast phase or saccadic component of a nystagmus beat and establish normative data, which is to be the subject of a co-authored paper" [Exhibit 11].

17. On June 20, 2011 in furtherance of the ongoing diligent collaboration of the co-inventors, Dr. Kiderman informed Dr. Cinberg via E-mail that Dr. Kiderman had analyzed preexisting data from normal subject for fast phase response of OKN testing to establish normative data for similar subjects.  Further, Dr. Kiderman asked if his co-inventor had a chance to obtain similar data [Exhibit 12].

18. On June 20, 2011 in response to Dr. Kiderman's E-mail of the same date and also in furtherance of the ongoing collaboration of the co-inventors, Dr. Cinberg advised Dr. Kiderman that he had not obtained any of the requested normative data.  Further, Dr. Cinberg advised Dr. Kiderman that Dr. Cinberg would not be submitting the IRB for committee review until September 2011.  Additionally, Dr. Cinberg suggested to Dr. Kiderman that he could select known TBI patients from the NKI database of subjects to compare to the obtained normative data [Exhibit 13].  The substance of the E-mails of

June 20, 2011 evidence the ongoing collaboration between Dr. Kiderman and Dr. Cinberg on this project.

19.  In furtherance of the ongoing collaboration of the co-inventors, Dr. Cinberg obtained eye tracking data from standard optokinetic tests on a set of TBI subjects (Motor Vehicle Accident (MVA) patients using NKI's I-Portal® brand device.  The optokinetic tests include providing a visual stimulus having a predetermined direction and speed of movement across a visual field of the subject; and the eye data includes monitoring movement of an eye of the subject while the subject views said stimulus, wherein the eye movements of conventional optokinetic tests include a slow eye velocity component responsive to said predetermined movement and a fast eye velocity component.  In furtherance of the ongoing collaboration of the co-inventors, Dr. Cinberg forwarded the obtained eye tracking data from standard optokinetic tests on the set of TBI subjects/ MVA patients to co-inventor Dr. Kiderman.

20.  On November 19, 2011 within the meaning of the patent law, Dr. Kiderman conceived of the an invention (and reduced it to practice) associated with TBI detection and a specific variable of OKN testing when he used a statistical approach using IBM SPSS software to separate results of the MVA patients from the normal database using average fast phase velocity as a separation criteria which established the presence of almost 90% group separation between prospective TBI subjects and normal using discriminant analysis using the calculated average fast phase velocity and more than 90% group separation between prospective TBI subjects and normal using binary regression. Dr. Kiderman's statistical analysis of November 19, 2011 provided the enabling support

necessary for the inventive conception of specifically using average fast phase velocity as a single separation criteria for TBI detection.

21.   In furtherance of the ongoing collaboration of the co-inventors, in November 19, 2011 Dr. Kiderman E-mailed his findings and supporting analysis to Dr. Cinberg.   Dr. Kiderman also suggested to his collaborator Dr. Cinberg that Dr. Kiderman would pursue similar analysis using the slow phase velocity components, and Dr. Kiderman requested input from his collaborator Dr. Cinberg [Exhibit 14].

22. On November 20, 2011, Dr. Cinberg responded to Dr. Kiderman's E-mail of the previous day and professed he did not have sufficient knowledge to comment of the particulars of Dr. Kiderman's statistical analysis.  In the November 20, 2011 E-mail, Dr. Cinberg proposed "tutoring" of himself to be better able to understand the proffered results of Dr. Kiderman [Exhibit 15].

23.   In Dr. Cinberg's response of November 20th, 2011, he acknowledged that the separation results of using average fast phase velocity as a separation criterion for TBI detection identified by Dr. Kiderman seemed significant.  Dr. Cinberg made additional proposals for furthering the ongoing collaboration on this project.

24.   In furtherance of the ongoing collaboration of the co-inventors, on November 25, 2011 Dr. Cinberg forwarded a draft of the proposed co-authored paper on the invention to Dr. Kiderman and requested assistance with the paper. [Exhibit 16 - email, Exhibit 17 – 2013 version of paper].  Peer reviewed publications are significant for NKI and others in this field for numerous business reasons, for example for facilitating FDA clearance, for

enhancing company image or reputation, for developing marketing strategies, for generating marketing leads, and for generating sales.

25.  In furtherance of the ongoing collaboration of the co-inventors, on November 26, 2011 Dr. Kiderman indicated to Dr. Cinberg that he had updated some of the information in the 13-19 year old subjects in the database of results used to verify the possible use of average fast phase velocity in OKN testing as a separation criteria for TBI detection [Exhibit 18].

26.  On November 26, 2011 Dr. Cinberg asked Dr. Kiderman a number of particulars regarding the data set used to verify the possible use of average fast phase velocity in OKN testing as a separation criterion for TBI detection [Exhibit 19].

27.  On April 25, 2012 Dr. Kiderman performed a reliability analysis regarding the use of average fast phase velocity in OKN testing as a separation criteria for TBI detection in the data set on hand, and in furtherance of the ongoing collaboration of the co-inventors he shared this analysis with his co-inventor Dr. Cinberg.  This analysis confirmed the repeatability or reliability of the identified separation criteria for TBI detection. Although this analysis is not believed to be technically necessary for the conception or reduction to practice of the claimed invention, it was viewed by the parties as a significant step in advancing the invention as a real world practical tool [Exhibit 20].

28.  Following the reliability analysis and based upon the favorable results obtained in the collaboration, the parties discussed more formally defining the collaboration and Dr. Kiderman forwarded a letter which outlined the collaboration to Dr. Cinberg and BDC on

May 22, 2012.  The letter of May 22, 2012 regarding the collaboration between the co-inventors states that the parties acknowledged that "Any new ideas generated out of this Collaboration will be jointly owned by BDC and NKI" [Exhibit 11].

29. In addition to the letter regarding the collaboration between the co-inventors, on May 22, 2012 Dr. Kiderman forwarded a proposed Mutual-Non-Disclosure Agreement to Dr. Cinberg and his BDC on May 22, 2012 [Exhibit 21].

30. Neither Dr. Cinberg nor BDC ever advised Dr. Kiderman or NKI that the outline of the collaboration as set forth in the letter of May 22, 2012 was considered to be in error in any respect.

31. Dr. Cinberg and the BDC signed the mutual non-disclosure agreement on September 5, 2012.

32. On August 6, 2012, Dr. Cinberg and/or BDC caused U.S. Patent Application 13/567,670 to be filed listing only Dr. Cinberg as the sole inventor [Exhibit 22].  Neither Dr. Cinberg and/or BDC were associated with any patent applications filed prior to U.S. Patent Application 13/567,670 which were related to the subject matter of U.S. Patent Application 13/567,670.

33.  The disclosure and claims of U.S. Patent Application 13/567,670 is a direct result of the Collaboration between NKI and BDC in which the parties acknowledged they have identified a novel analytic variable with regard to concussions that is a subcomponent of the standard Optokinetic or OKN test, wherein that novel analytic variable is the fast phase component of a nystagmus beat.

34.    The disclosure and claims of U.S. Patent Application 13/567,670 included confidential and proprietary information of NKI developed by Dr. Kiderman representing valuable trade secrets of NKI.   Dr. Kiderman's inventive contribution to the subject matter of the claims of U.S. Patent Application 13/567,670 is valuable proprietary information of NKI protected under the contract between the parties and under the Pennsylvania Uniform Trade Secrets Act.   Dr. Kiderman's contributions to the subject matter of the disclosure as a whole of U.S. Patent Application 13/567,670 that does not rise to the level of inventorship is also valuable proprietary information of NKI protected under the contract between the parties and under the Pennsylvania Uniform Trade Secrets Act.

35.   Dr. Kiderman is properly a co-inventor of the subject matter of the claims of U.S. Patent Application 13/567,670 under U.S. Patent Law, and the applications and patents claiming priority thereto, and NKI is the owner of Dr. Kiderman's inventorship interest in U.S. Patent Application 13/567,670 and the applications and patents claiming priority thereto.

35.   Dr. Cinberg and/or BDC intentionally caused Dr. Kiderman to be omitted from being listed as an inventor of U.S. Patent Application 13/567,670.  This was outrageous and egregious conduct done in a reckless disregard of NKI's ownership rights.

36.  Neither Dr. Cinberg nor Balance Disorder Center ever advised Dr. Kiderman or NKI regarding the preparation or filing or prosecution of U.S. Patent Application 13/567,670.

37.   On August 6, 2012, Dr. Cinberg and/or BDC intentionally caused U.S. Patent Application 13/567,670 to be maintained in secret by the United States Patent and Trademark Office, and thus unavailable to NKI until it was patented, by filing a non-publication request [Exhibit 23].

38.   Dr. Cinberg and/or BDC intentionally caused further U.S. Patent Application 13/567,670 to issue as U.S. Patent No. 8,585,589 [Exhibit 24], which was outrageous and egregious conduct done in a reckless disregard of NKI's ownership rights.

39.   Dr. Cinberg and/or BDC intentionally caused further U.S. Patent Applications to be filed that claimed priority, directly or indirectly to U.S. Patent Application 13/567,670, and caused related U.S. Patent Nos. 8,808,179 and 9,084,573 to issue from applications claiming priority to the '670 application [Exhibits 25-26].  These Patents also improperly listed only Dr. Cinberg as the inventor and improperly omitted Dr. Kiderman.  These Patents included confidential and proprietary information of NKI developed by Dr. Kiderman representing valuable trade secrets of NKI.  Dr. Kiderman's inventive contribution to the subject matter of the claims of these patents is valuable proprietary information of NKI protected under the contract between the parties and under the Pennsylvania Uniform Trade Secrets Act.  Dr. Kiderman's contributions to the subject matter of the disclosure as a whole of these patents that does not rise to the level of inventorship is also valuable proprietary information of NKI protected under the contract between the parties and under the Pennsylvania Uniform Trade Secrets Act.  The Defendants actions in filing prosecuting and issuing these patents was also outrageous and egregious conduct done in a reckless disregard of NKI's ownership rights.

40.   The claims of U.S. Patent Nos. 8,808,179 and 9,084,573 are not patentably distinguishable from the claims of U.S. Patent No. 8,585,589.

41.  NKI discovered the existence of the '589 patent in the second quarter of 2014 and requested that the inventorship of this patent (and related continuing applications and/or patents) be corrected to properly list Dr. Kiderman by the Defendant.

42.  Dr. Cinberg and/or BDC refused NKI's demands to correct the inventorship of the '589 patent (and simultaneously the ownership) and attempted to hijack NKI's own technology by attempting to sell these patent rights in the NKI co-developed and properly co-owned technology back to NKI, and possibly to others.

43.  NKI caused to be filed U.S. Patent Application 14/284,718 on May 22, 2014 which properly lists Dr. Kiderman and Dr. Cinberg as co-inventors and which published January 15, 2015 as U.S. Publication Number 2015-0018709 [Exhibit 27].

44.   U.S. Patent Application 14/284,718 claims priority, indirectly, to U.S. Patent Application 13/567,670, and has a disclosure that is substantially identical to the disclosure of U.S. Patent Application 13/567,670.

45.  U.S. Patent Application 14/284,718 has claims that are patentably indistinguishable from those of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573.

46.  NKI requested and was granted an interference proceeding, bearing Interference No. 106,043 (DK), within the United States Patent and Trademark Office.

47.    Pending Interference No. 106,043 (DK) is expected to establish the proper inventorship of the subject inventions and NKI has further requested within this interference that the United States Patent and Trademark Office hold U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 as invalid for failing to name the proper inventors. Dr. Kiderman submitted a declaration in this interference in support of NKI's position and establishing many facts set forth herein [Exhibit 28].

48. The Patent Office, in the subject interference proceeding, will not address damages that may have occurred from Dr. Cinberg and/or BDC intentional actions to usurp NKI's patent rights, but will only invalidate the improperly filed patents and allow the applications with the proper inventorship entity to proceed.


   IV. COUNT 1 BREACH OF CONTRACT -By Defendants Dr. Cinberg and/or BDC

49.  All above numbered paragraphs are incorporated herein by reference as if set forth in full.

50. The actions of Defendant outlined above are in willful breach of the contract signed by the Defendants on September 12, 2012 [Exhibit 21].

51. The Defendant's unauthorized use of NKI's confidential information in the preparation and filing and prosecution of the applications issuing as the U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 is a breach of the contract signed by the Defendants on September 12, 2012.

52.  Defendant's unauthorized use of NKI's confidential information caused a loss of the confidential status of the NKI information contained within the disclosure of U.S. Patent Application 13/567,670 when the corresponding patent issued on November 19, 2013.

53.  Defendant's unauthorized use of NKI's confidential information caused a loss of the potential foreign patent rights of the Dr. Kiderman's invention contained within the disclosure of U.S. Patent Application 13/567,670 at least when the corresponding patent issued on November 19, 2013.

54.  Dr. Cinberg had no prior patents in this particular field, and limited knowledge of the patent landscape in this field, leading directly to large deficiencies in what was disclosed and what was claimed and what could be claimed in pending applications, detrimentally affecting the meaningful scope and practical value of the issued patents.  Material that is not disclosed in the patent application cannot be claimed and cannot be protected by a patent.  Material that is not disclosed in the patent application, but obvious in light of the disclosure of a patent cannot be claimed in and cannot be protected by a later filed patent application and will thus be dedicated to the public.

55.  NKI has extensive knowledge of the patents in this field but Defendant's actions prevented NKI from having an opportunity to input this knowledge into the drafting of the subject patent application detrimentally affecting the meaningful scope and practical value of the issued patents.

56.  NKI has been deprived of legal title to the subject patents due to Defendants actions, at least until the interference is concluded and the applications with the correct inventorship and NKI co-ownership can be issued, and NKI has lost the commercial advantages of these patents.

57. NKI has been deprived of the ability to control the timing of the filing of the subject patents due to Defendants actions, and the ability to properly time the filing to best conform with the commercialization of products associated with the subject patents and with other NKI patents and has lost meaningful patent term and the commercial advantages thereof.

58.  Defendants actions impeded NKI's commercialization of products (including but not limited to product development, product launch, product sales, product marketing and growth in product sales) in this admittedly promising area of use of fast phase variables in OKN testing as a biomarker for TBI co-developed by NKI the due to the publication of the Defendant's improper patents.

59. Defendant's actions caused NKI to expend time and money in the development of alternative variables that were equally effective as fast phase variables in OKN testing as a biomarker for TBI which could be implemented in TBI testing or screenings.

60. Defendant's actions caused NKI to delay continued research in this promising area and has resulted in a loss or delay of NKI's scientific publications in this area detrimentally effecting NKI's reputation, future developments and business opportunities.

61. Defendant's actions caused NKI to expend considerable expense in correcting the inventorship and ownership of the subject patents.

62. Defendant's use of NKI confidential material has damaged NKI's reputation in this field and the associated valuation of NKI and Defendant's use of NKI confidential material unjustly enriched Defendant.

63. Defendant's use of NKI confidential material has prevented NKI from applying for and/or be granted research grants in this area.

WHEREFOR, Plaintiff, NKI requests judgment in favor of NKI and against Dr. Cinberg and BDC for monetary damages in the amount in excess of $50,000, exclusive of interests and costs and demands a jury trial; and other remedies in favor of NKI as this Honorable Court deems just and reasonable, including but not limited to injunctive relief as follows:

The actions of Defendants set forth above threatens irreparable harm and/or harm to NKI for which there is no adequate remedy at law, and NKI requests this Honorable Court issue a permanent injunction:

Preventing Defendants Dr. Cinberg and BCD from any further use of any confidential material of NKI;

Requiring Defendants Dr. Cinberg and BCD to publically acknowledge that U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 were developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573, wherein the public acknowledgement includes correspondence to all previously contacted prospective purchasers of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 and inclusion on all advertising, promotional or marketing material of Defendants Dr. Cinberg and BCD listing any of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573.

Requiring Defendants Dr. Cinberg and BCD to assign an undivided partial ownership interest that each Defendant may have in each of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 to NKI.

V. COUNT 2 MISAPPROPRIATION OF TRADE SECRETS By Defendants Dr.

Cinberg and/or BDC

64.  All above numbered paragraphs are incorporated herein by reference as if set forth here in full.

65. NKI's confidential information, including but not limited to Dr. Kiderman's inventive contributions, used in the preparation and filing and prosecution of the applications issuing as the U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 represent valuable trade secrets of NKI.

66. The Defendant's unauthorized use of NKI's trade secrets in the preparation and filing and prosecution of the applications issuing as the U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 is willful and malicious misappropriation of NKI's trade secrets.

67.  Defendant's unauthorized use of NKI's trade secrets caused a loss of the confidential status of the NKI information contained within the disclosure of U.S. Patent Application 13/567,670 when the corresponding patent issued on November 19, 2013, and loss of the associated NKI trade secrets.

68.  Defendant's unauthorized use of NKI's trade secrets caused a loss of the potential foreign patent rights of the Dr. Kiderman's invention contained within the disclosure of U.S. Patent Application 13/567,670 at least when the corresponding patent issued on November 19, 2013.

69.  Dr. Cinberg had no prior patents in this particular field, and limited knowledge of the patent landscape in this field, leading directly to large deficiencies in what was disclosed and what was claimed and what could be claimed in pending applications, detrimentally affecting the meaningful scope and practical value of the issued patents.  Material that is

not disclosed in the patent application cannot be claimed and cannot be protected by a patent.  Material that is not disclosed in the patent application, but obvious in light of the disclosure of a patent cannot be claimed in and cannot be protected by a later filed patent application and will thus be dedicated to the public.

70.   NKI has extensive knowledge of the patents in this field but Defendant's actions prevented NKI from having an opportunity to input this knowledge into the drafting of the subject patent application detrimentally affecting the meaningful scope and practical value of the issued patents.

71.   NKI has been deprived of full legal title to the subject patents due to Defendants actions, at least until the interference is concluded and the applications with the correct inventorship and NKI co-ownership can be issued, and NKI has lost the commercial advantages of these patents.

72. NKI has been deprived of the ability to control the timing of the filing of the subject patents due to Defendant's misappropriation of NKI trade secrets, and the ability to properly time the relevant patent application filing to best conform with the commercialization of products associated with the subject patents and with other NKI patents and NKI has lost meaningful patent term and the commercial advantages thereof.

73. Defendant's misappropriation of NKI trade secrets impeded NKI's commercialization of products (including but not limited to product development, product launch, product sales, product marketing and growth in product sales) in this admittedly promising area of use of fast phase variables in OKN testing as a biomarker for TBI co-developed by NKI the due to the existence of the Defendant's improper patents.

74. Defendant's misappropriation of NKI trade secrets caused NKI to expend time and money in the development of alternative variables that were equally effective as fast phase variables in OKN testing as a biomarker for TBI which could be implemented in TBI testing or screening.

75. Defendant's misappropriation of NKI trade secrets caused NKI to delay continued research in this promising area and has resulted in a loss or delay of NKI's scientific publications in this area detrimentally effecting NKI's reputation, future developments and business opportunities.

76 Defendant's misappropriation of NKI trade secrets caused NKI to expend considerable expense in correcting the inventorship and ownership of the subject patents.

77. Defendant's misappropriation of NKI trade secrets have damaged NKI's reputation in this field and the associated valuation of NKI.

78. Defendant's misappropriation of NKI trade secrets unjustly enriched Defendant.

79. Defendant's misappropriation of NKI trade secrets has prevented NKI from applying for and/or be granted research grants in this area.

WHEREFOR, Plaintiff, NKI requests judgment in favor of NKI and against Dr. Cinberg and BDC for monetary damages in the amount in excess of $35,000, exclusive of interests and costs and demands a jury trial; and for exemplary damages in the amount of twice the monetary damages pursuant to 12 Pa.C.S. § 5303(b); for award reasonable attorney fees, expenses and costs pursuant to 12 Pa.C.S. § 5305; and other remedies in favor of NKI as this Honorable Court deems just and reasonable, including but not limited to injunctive relief as follows:

The actions of Defendants set forth above threatens irreparable harm and/or harm to NKI for which there is no adequate remedy at law, and NKI requests this Honorable Court issue a permanent injunction:

Preventing Defendants Dr. Cinberg and BCD from any further use of any confidential material of NKI;

Requiring Defendants Dr. Cinberg and BCD to publically acknowledge that U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 were developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573, wherein the public acknowledgement includes correspondence to all previously contacted prospective purchasers of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573  and inclusion on all advertising, promotional or marketing material of Defendants Dr. Cinberg and BCD listing any of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573.

Requiring Defendants Dr. Cinberg and BCD to assign an undivided partial ownership interest that each Defendant may have in each of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 to NKI.

VI. COUNT 3 CONVERSION -By Defendants Dr. Cinberg and/or BDC

80.  All above numbered paragraphs are incorporated herein by reference as if set forth here in full.

81.  The disclosed and claimed subject matter of U.S. Patent 9,084,573 was developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent No. 9,084,573.  The issuance of U.S. Patent

No. 9,084,573 deprived NKI of the rights in this property without the owner NKI's consent and without lawful justification and is a conversion of NKI's rights in property by the Defendant.

82. The Defendant's unauthorized issuance of U.S. Patent No. 9,084,573 is outrageous and egregious conduct done in a reckless disregard of NKI's ownership rights in the property.

83. Dr. Cinberg had no prior patents in this particular field, and limited knowledge of the patent landscape in this field, leading directly to large deficiencies in what was disclosed and what was claimed and what could be claimed in pending applications, detrimentally affecting the meaningful scope and practical value of U.S. Patent No. 9,084,573. Material that is not disclosed in the patent application cannot be claimed and cannot be protected by a patent.  Material that is not disclosed in the patent application, but obvious in light of the disclosure of a patent cannot be claimed in and cannot be protected by a later filed patent application and will thus be dedicated to the public.

84.  NKI has extensive knowledge of the patents in this field but Defendant's outrageous and egregious conduct prevented NKI from having an opportunity to input this knowledge into the drafting of the subject patent application detrimentally affecting the meaningful scope and practical value of U.S. Patent No. 9,084,573.

85.  NKI has been deprived of full legal title to U.S. Patent No. 9,084,573 due to Defendant's conversion of NKI's rights, at least until the interference is concluded and the applications with the correct inventorship and NKI co-ownership can be issued, and NKI has lost the commercial advantages of U.S. Patent No. 9,084,573.

86. NKI has been deprived of the ability to control the timing of the filing of the subject patent due to Defendant's conversion of NKI's rights, and the ability to properly time the relevant patent application filing to best conform with the commercialization of products associated with the subject patents and with other NKI patents and NKI has lost meaningful patent term and the commercial advantages thereof.

87. Defendant's conversion of NKI's rights impeded NKI's commercialization of products (including but not limited to product development, product launch, product sales, product marketing and growth in product sales) in this admittedly promising area of use of fast phase variables in OKN testing as a biomarker for TBI co-developed by NKI the due to the existence of the Defendant's improper patent.

88. Defendant's conversion of NKI's rights caused NKI to expend time and money in the development of alternative variables that were equally effective as fast phase variables in OKN testing as a biomarker for TBI which could be implemented in TBI testing or screening.

89. Defendant's conversion of NKI's rights caused NKI to delay continued research in this promising area and has resulted in a loss or delay of NKI's scientific publications in this area detrimentally effecting NKI's reputation, future developments and business opportunities.

90 Defendant's conversion of NKI's rights caused NKI to expend considerable expense in correcting the inventorship and ownership of the subject patent.

91. Defendant's conversion of NKI's rights have damaged NKI's reputation in this field and the associated valuation of NKI.

92. Defendant's conversion of NKI's rights unjustly enriched Defendant.

93. Defendant's conversion of NKI's rights has prevented NKI from applying for and/or be granted research grants in this area.

WHEREFOR, Plaintiff, NKI requests judgment in favor of NKI and against Dr. Cinberg and BDC for monetary damages in the amount in excess of $35,000, exclusive of interests and costs and demands a jury trial; and for punitive damages in the amount this Honorable Court deems just and reasonable; and other remedies in favor of NKI as this Honorable Court deems just and reasonable, including but not limited to injunctive relief as follows:

The actions of Defendants set forth above threatens irreparable harm and/or harm to NKI for which there is no adequate remedy at law, and NKI requests this Honorable Court issue a permanent injunction:

Preventing Defendants Dr. Cinberg and BCD from any further use of any confidential material of NKI;

Requiring Defendants Dr. Cinberg and BCD to publically acknowledge that U.S. Patent No. 9,084,573 was developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent No. 9,084,573, wherein the public acknowledgement includes correspondence to all previously contacted prospective purchasers of U.S. Patent No. 9,084,573 and inclusion on all advertising, promotional or marketing material of Defendants Dr. Cinberg and BCD listing any of U.S. Patent No. 9,084,573.

Requiring Defendants Dr. Cinberg and BCD to assign an undivided partial ownership interest that each Defendant may have in U.S. Patent No. 9,084,573 to NKI.

VII. COUNT 4 UNFAIR COMPETITION -By Defendants Dr. Cinberg and/or BDC

94.  All above numbered paragraphs are incorporated herein by reference as if set forth here in full.

95.  The disclosed and claimed subject matter of U.S. Patent 9,084,573 was developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent No. 9,084,573.  The issuance of U.S. Patent No. 9,084,573 deprived NKI of the rights in this property without the owner NKI's consent and without lawful justification and is unfair competition by the Defendant.

96. The Defendant's unauthorized issuance of U.S. Patent No. 9,084,573 is outrageous and egregious conduct done in a reckless disregard of NKI's ownership rights in the property.

97.  Dr. Cinberg had no prior patents in this particular field, and limited knowledge of the patent landscape in this field, leading directly to large deficiencies in what was disclosed and what was claimed and what could be claimed in pending applications, detrimentally affecting the meaningful scope and practical value of U.S. Patent No. 9,084,573. Material that is not disclosed in the patent application cannot be claimed and cannot be protected by a patent.  Material that is not disclosed in the patent application, but obvious in light of the disclosure of a patent cannot be claimed in and cannot be protected by a later filed patent application and will thus be dedicated to the public.

98.  NKI has extensive knowledge of the patents in this field but Defendant's outrageous and egregious conduct prevented NKI from having an opportunity to input this knowledge into the drafting of the subject patent application detrimentally affecting the meaningful scope and practical value of U.S. Patent No. 9,084,573.

99.   NKI has been deprived of full legal title to U.S. Patent No. 9,084,573 due to Defendant's actions, at least until the interference is concluded and the applications with the correct inventorship and NKI co-ownership can be issued, and NKI has lost the commercial advantages of U.S. Patent No. 9,084,573.

100.  NKI has been deprived of the ability to control the timing of the filing of the subject patent due to Defendant's actions, and the ability to properly time the relevant patent application filing to best conform with the commercialization of products associated with the subject patents and with other NKI patents and NKI has lost meaningful patent term and the commercial advantages thereof.

101.  Defendant's actions impeded NKI's commercialization of products (including but not limited to product development, product launch, product sales, product marketing and growth in product sales) in this admittedly promising area of use of fast phase variables in OKN testing as a biomarker for TBI co-developed by NKI the due to the existence of the Defendant's improper patent.

102.  Defendant's actions caused NKI to expend time and money in the development of alternative variables that were equally effective as fast phase variables in OKN testing as a biomarker for TBI which could be implemented in TBI testing or screening.

103.  Defendant's actions caused NKI to delay continued research in this promising area and has resulted in a loss or delay of NKI's scientific publications in this area detrimentally effecting NKI's reputation, future developments and business opportunities.

104  Defendant's actions caused NKI to expend considerable expense in correcting the inventorship and ownership of the subject patent.

105. Defendant's actions have damaged NKI's reputation in this field and the associated valuation of NKI.

106. Defendant's actions unjustly enriched Defendant.

107. Defendant's actions has prevented NKI from applying for and/or be granted research grants in this area.

WHEREFOR, Plaintiff, NKI requests judgment in favor of NKI and against Dr. Cinberg and BDC for monetary damages in the amount in excess of $35,000, exclusive of interests and costs and demands a jury trial; and for punitive damages in the amount this Honorable Court deems just and reasonable; and other remedies in favor of NKI as this Honorable Court deems just and reasonable, including but not limited to injunctive relief as follows:

The actions of Defendants set forth above threatens irreparable harm and/or harm to NKI for which there is no adequate remedy at law, and NKI requests this Honorable Court issue a permanent injunction:

Preventing Defendants Dr. Cinberg and BCD from any further use of any confidential material of NKI;

Requiring Defendants Dr. Cinberg and BCD to publically acknowledge that U.S. Patent No. 9,084,573 was developed, at least in part, based upon contributions of Dr. Kiderman of NKI and NKI is the owner of Dr. Kiderman's contributions to U.S. Patent No. 9,084,573, wherein the public acknowledgement includes correspondence to all previously contacted prospective purchasers of U.S. Patent No. 9,084,573 and inclusion on all advertising, promotional or marketing material of Defendants Dr. Cinberg and BCD listing any of U.S. Patent No. 9,084,573.

Requiring Defendants Dr. Cinberg and BCD to assign an undivided partial ownership interest that each Defendant may have in U.S. Patent No. 9,084,573 to NKI.

VIII. COUNT 5 UNJUST ENRICHMENT -By Defendants Dr. Cinberg and/or BDC

108.  All above numbered paragraphs are incorporated herein by reference as if set forth in full.

109. To the extent any of the actions of Defendant outlined above and included in count 1 BREACH OF CONTRACT are outside of the contract signed by the Defendants on September 12, 2012 [Exhibit 21], then these actions of Defendant are violations of NKI's rights under the doctrine of unjust enrichment and the damages for such actions set forth in count 1 BREACH OF CONTRACT are repeated herein by reference.

VIII. COUNT 6 CORRECTION OF INVENTORSHIP OF -By Defendants Dr. Cinberg and/or BDC

110.  All above numbered paragraphs are incorporated herein by reference as if set forth in full.

111. The inventorship of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 is incorrect because these patents fail to properly list Dr. Kiderman as a co-inventor and the subject matter of the claims of each of these patents were developed, at least in part, based upon contributions of Dr. Kiderman of NKI.

112. The Plaintiff NKI is the owner of Dr. Kiderman's right title and interest in his inventorship interest in U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 and may bring this count pursuant to 35 USC 256.

113.   All parties concerned with the inventorship of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 in dispute for which correction of inventorship is sought have been put on notice or will be put on notice pursuant to filing and service of this Amended Complaint.


, WHEREFOR, Plaintiff, NKI requests judgment in favor of NKI and respectfully request that this Court grant relief  with the issuance of an order pursuant to 35 U.S.C. § 256, requiring the Director of the United States Patent and Trademark Office to correct inventorship of U.S. Patent Nos. 8,585,589, 8,808,179 and 9,084,573 to include Dr. Kiderman.


*/s/ Blynn L. Shideler*
**BLYNN L. SHIDELER**
**PA I.D. #64386**
**BLK LAW GROUP**
**3500 Brooktree Road, Suite 200**
**Wexford, PA  15090**
**(724) 934-5450 (phone)**
**(724) 934-5461 (facsimile)**
**Email:  blynn@blklawgroup.com**